We'll take the third case of this morning, Wanda Williams v. The Crane Company. Good morning. May it please the Court, Keith McDaniel on behalf of Manitowoc Cranes, LLC. I've reserved four minutes for rebuttal. Manitowoc asks this Court to reverse the judgment because the jury's verdict is based on insubstantial evidence to support its findings. The jury findings do not, as a matter of law, support the legal conclusions that may be inferred from the verdict or implied through reading it. Here, plainly unreasonable inferences of those which amount to speculation or conjecture resulted in the jury's finding that the subject crane was unreasonably dangerous or defective when it left the custody in control of Manitowoc. Alternatively, we ask the Court to order a new trial because the jury's verdict was tainted by the Court's allowance of improper expert testimony, by the introduction of other accidents, and also for its failure to allow us to rebut character evidence offered by plaintiff. As an introduction, further, I have disseminated to the panel and to counsel some of the exhibits at trial that may make some of the comments somewhat more clear. You're welcome, certainly, to not look at them or to look at them. By way of introduction, Tale A are some photos that give you some idea of the crane about which we are speaking. It is an exemplar model 16,000 crane. This is a colossal piece of machinery. Because of weight limitations, it takes 20 to 40 truckloads of materials to assemble it. It takes another crane to assemble it. It would hardly fit its footprint within this room. It is accompanied by a boom that is in 10-by-10-foot sections that at the time of the incident rose over 200 feet in the air. These are colossal machines. They're magnificent machines. Without them, we would not be where we are with respect to the industrialized nation that we are. In order to prevail in this case, plaintiff was required to prove under the Mississippi Product Liability Act that the model 16,000 crane was defective for lack of an adequate warning, that the failure to include Dr. Sinkho's warning, he was the expert utilized by plaintiffs, rendered the model 16,000 unreasonably dangerous to the ordinary crane operator, and that the lack of Dr. Sinkho's warning approximately caused Mr. Williams injuries. Manitowoc built a reasonably safe product. Manitowoc is not required to build a product that is accident-proof or foolproof or to incorporate into its product every innovation which might have rendered a product more safe. In fact, Mississippi law holds that it is not required to use the best and most obvious warnings but only adequate warnings. Under Mississippi law, a seller may also reasonably assume that his warnings will be read and heeded. A product bearing such a warning which is safe for use, if it is followed, is not in a defective condition, nor is it unreasonably dangerous. What does the Mississippi Product Liability Act say about adequate warning? An adequate warning is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of and the ordinary knowledge common to an ordinary consumer who purchases the product. Therefore, what is the framework of the duty to warn? It's the dangers and the safe use of the product. It seems to me your argument, looking at the Mississippi Product Liability Act, very much turns on what has to be warned. You insist in your briefing, and you are here, that the warning was adequate. Don't let this tip over. You may be killed. Fortunately, that didn't happen, but the danger of a tip over was clearly warned. I don't see case law sided by either side. It really gets into the specific issue here, which is how can you be killed or badly injured? To what extent is that warning also necessary? It seems to me if it is necessary, it's because it is providing sufficient information, using the language of the statute, that would allow a reasonably prudent person to react to this danger starting to occur. What would you say the best case is interpreting Mississippi Products Liability Act law on how to measure the degree of detail and what actually is the focus of the required warning? I don't know that I can give you a case that tells you exactly how to measure the degree of the detail, but the language of the Act talks about the safe use of the product and the danger. Here the danger is tip over, safely using it. There is no safe way to tip a crane. Cases that deal with consequential sort of warnings, in other words, things that specifically that may happen to you, and plaintiffs have claimed you should have given these and for your failure to give them, and the product is defectively worn, would be for a veto. Austin and Wilbert, the Harris v. International Trucks Company, even the Taser case out of the city of Cleveland. Are you saying it's enough to say that you may be killed if you let this tip over? And they're saying that's not enough. We must be told how we would be seriously injured or killed in order that the operator or whoever is getting the warning can perhaps better prepare and help himself. You say in your briefing you did in the district court as well, though it didn't carry the day. There's so many different ways to be injured if there's a tip over that what we have here is just one of many warnings that would be necessary to cover the waterfront, but that is the only one at issue in this case. I'm not sure how far that takes you. Well, Judge, from the factual evidence in this case, all of the individuals at the scene operating cranes, Abbott, Smith, Horn, the rigger, and the overall supervisor, Mr. Williams, delineated the number of catastrophic things that can happen. They're all crane operators. They all knew this.  Didn't these reasonable people also say, or at least several of them, imposing your friends on the other side have in their brief, that a fair number of people who were operating one for 35 years didn't know that these counterweights would fall in that way? Is that at least evidence in the record? Mr. Williams had been operating for 35 years, and he did not testify. We do not know. Mr. Abbott wasn't operating for a number of years, and he did say he did not know that. He's the gentleman that was standing and watching and said, I started seeing it happen, and I would have run like a 20-year-old if I had seen Dr. Singo this morning. He has the benefit of having seen what happened. The factual evidence is by those on the scene that Mr. Williams was fighting, if you will, and was still in the calve. There's also the testimony of Mr. Smith. But, I mean, look, I mean, your man said he would have started running if this had happened. Well, he didn't need a warning to tell him that. If those things start falling, he's going to run without a warning. Well, that is part of what is here, and that's the open and obvious effect of this with respect to what we are required to warn and who we are warning. We're not warning me or any of you that may have never been around a crane. We have to warn the reasonable user, and the reasonable user of these cranes were all certified crane operators. They all knew the OSHA requirements and that sort of thing. So, you know, this concept of needing to be warned to avoid the tipover, it's something they all knew. And for whatever reason, that given day, it was ignored by everyone. But to Mr. Smith, Mr. Smith— No, I mean, it wasn't a very specific warning. It just said, as I understand it, it just said tipovers are dangerous, right? There were within the manual at least 16 references to the different things that can cause a tipover, and some of those mentioned specifically that the consequences of a tipover are serious injury and death. But there was, as I understand it, there was never an instruction or a warning, do not tip—do not put this crane in such a situation that it will tip over. I mean, because there were slants. I mean, he knew it was slanting or whatever it was. The grade change. The grade change. I think all the warnings talk about do not tip the crane. Does it say do not tilt, or does it just say that it is dangerous to do so? It doesn't say do not tilt. It says it is dangerous to tilt under some circumstances. You have the word tilt. It specifically talks about a tilt over. A tipover. A tipover. And in that sense, it's advised against by a number of different things. Overloading will cause a tipover. Going on a grade that is too steep will cause a tipover. There are a number of things where it is said do these things and you will result in a tipover, so don't do them because— But it never says do not tip over, or if it tips over, get out of the cab. It never says if it tips over, get out of the cab. Can you flesh out Exhibit D of your exhibit book here? This is Dr. Sinkhose's proposed warning. Flesh it out. With respect to that particular warning, this is the expert that you will recall that the court struck with respect to his design alternative for failure to come up with something that the court thought was feasible. He defined it. Dr. Sinkhose defined the warning as a sort of a sample warning of what I think they should use something like. He said after studying the hazard, the warning pretty much writes itself. He didn't tell where it should go. He had no testing to determine where it would be heated. In fact, in it, what he depicts as the counterweight sliding off of the deck of cards is not the way they work. If you look at tab A, you will see on the counterweights there are lugs and a ladder, and in fact, in a tipover situation, the counterweight has to get above that. The hazard avoidance strategy is not given. The injury mechanism, he talks about a crush hazard. That's Mr. Williams was seriously injured, but that's not striking the calve is not what happened here. No indication of how to avoid a tipover. So at best, it is an escape strategy that doesn't tell one why they're there or how to avoid it. It's limited only to the operator. There was another gentleman who was in a building crushed by a boom that was injured, so it doesn't apply to him at all. And he admits all of the details that I've just talked about I didn't put in because people aren't going to read that anyway. So that is what is the basis of this machine being considered unreasonably dangerous. And if you look at tab C, well first at tab B, so that you get some idea. Two cranes, initially three cranes were lifted, were used to lift the bow of a boat. And if you can see, the bow is now pointed down, so the point of the boat is pointed down toward the earth. Mr. Smith's crane is the one furthest away, the red one. I'm sorry, Mr. Williams' crane is the one furthest away. Red, you see his boob sticking up. Mr. Smith's crane is nearest to the picture. And then you see Mr. Abbott, he's driving his crane under the load getting to the other side because they were going to flip that bow, so it would then be mated to the end of this ship. Are we looking at exhibit B? Exhibit B, Your Honor, is the setup initially. Is that what you're talking about now? Now, with respect to that, in terms of this escape strategy that this warning is meant to convey, flip over to number C, or tab C. What you will see there is consistent with what Mr. Smith testified to, and it doesn't take one knowledgeable in Newtonian physics to understand. When the bow of that ship went down, in the same way if I set my pen on this desk, it's not going to stand up. That bow was not going to stand up. That 250 tons had to go somewhere, and it pulled that crane with it so that now the crane is completely inverted on the ends of its trolleys. Now, the actual testimony from those at the scene is the belief was Mr. Williams was trying to fight the tip over, so he's still in that cow. And Mr. Smith, who was in the other 1600, says, when I hear put it down, put it down, within three seconds that bow is rolling over. So with respect to what we see as D, there is no proof that it would have allowed any operator in those circumstances to escape that sort of a catastrophic event. That was the product of the bow pulling the crane over after the misuse had placed the crane in a position where this result was certain. Isn't there evidence that the entire tip over took about three minutes? That is based upon… Is there some evidence of that? There is some evidence of that, Your Honor, but the problem with it is how you define the tip over. It's based upon using these that are – there's a picture every 30 seconds. And so there was a measurement made by plaintiff's expert on the raised boom of Mr. Williams' crane, and then he assumes that it is moving because of a tip. The testimony is that when the word from the guy watching it was put it down, put it down, which has to be when he observed the tip happening, within three seconds the other crane operator sees the bow rolling over and pulling the boom of Mr. Williams' crane with it. But, yes, there is testimony based upon these photos as he reads them. But your interpretation… That the entire tip event took three minutes. I'm saying the factual testimony is that he's in the crane fighting whatever is going on and that the man on the ground charged to supervise the lift is alerted to the tip and says put it down, put it down, and the other crane operator says within three seconds I see the bow rolling over and pulling the crane with it. The import of your testimony or your reference facts is that three minutes that the plaintiff here for three minutes knew that the crane was tipping over? Is that what you're saying? That's not what I'm saying. That's not what I'm saying. There is no evidence of that. What is the three-minute period we're talking about? The three-minute period, the photos that I have that show the process, there was a time-lapse camera at the site, and it took a picture every 30 seconds. And one of plaintiff's experts looked at those pictures after the fact and said I see the boom of Mr. Williams' crane moving if I put it on a fixed point. Therefore, it must have been tipping for three minutes. That's not consistent with the factual testimony. All right, counsel. Thank you. I have a real problem with this warning, and maybe we're talking about relating the cause of the accident to the lack of a warning. But it just says, I don't know where this is going to be, how this would have prevented the accident and where it would have been located. And I understand there was no suggestion as to where it was located. But if it says danger, crush hazard, fallen counterweights can impact cab. But how did that give the plaintiff any warning that it was going to happen? I mean, unless you walk into a cab, say this was in his cab, you walk into his cab and you see this, you say, well, that might happen. I'm not going to work here. And you leave. But more than that, it doesn't tell you anything. I mean, he never knew. How was he going to know when it was going to fall, under what circumstances it was going to fall? I mean, this is no better than saying if you walk along, something may fall out of the sky from a spaceship and hit you in the head. That's all that says. I'm sorry. Your Honor, the evidence from trial was that that warning, Dr. Singhose's proposed warning, that should have either been in the manual or on the cab or on the crane itself. How would this possibly have prevented this accident if he had seen it? Because he didn't know, as I understand it, he didn't know that the counterweights were falling until they actually fell. Your Honor, the— Should he have been looking at them all the time? What that warning conveys, Your Honor, is that when the cab tips forward, the orientation of the crane in the warning is that when the crane tips forward, the unique danger to the Model 16,000 that uses these unsecured counterweights is that the counterweights will fall and will fall towards and into the operator cab of the 16,000— That's not what it says. —when it tips. Your Honor, the testimony from Dr. Singhose was that it was to convey, and it came in without objection or contradiction, was that it was to convey to the operator that when the crane tips, that these counterweights can and will fall off. And the inquiry— Why would the defendant need to object to that? That was his testimony about what it was intending to convey? What would the objection have been? Just that there's no assignment of error was the point of saying that there is no objection. The critical inquiry under the Mississippi statute is that a defendant, a manufacturer, is required to warn of the danger that it knows about or should know about, the danger that causes the damage. And in this case, what is particularly peculiar to the 16,000— There's only three model cranes in the record that utilize this same unsecured counterweight design, and we're talking about fewer than 300 cranes. The 16,000, which Mr. Williams was operating, had 200. There were only 200 of these. You still haven't told me how this would have prevented the accident or prevented the injury to the plane. Your Honor, to answer that question, the question hinges on proximate causation. And Manitowoc argues that the pertinent inquiry is what was the event— they argue that the tip is what caused the injury, and the tip is not what caused the injury. The incident— You just said it. You just told me that it was, though. You said that this was read in conjunction with the fact that if you tip, this may happen. Is that what— No, Your Honor. The testimony is that, again, peculiar to the 16,000 design with the unsecured counterweights, that when the crane tips—and cranes do tip. This is something that operators fight every day when they get in the crane. The testimony is that they do. It's called getting light where the tracks come off the ground a little bit, and then the operator takes measures to then save the crane, to then either increase the boom angle, which would then add more capacity to it, set the boom, set the load down, decrease the radius. There are things that operators do every day when these cranes tip. So at what point should the plaintiff have known that trying to adjust the tipping was not going to work in this case? Well, the testimony, Your Honor, is that the tip—these unsecured counterweights fall, these 18,000-pound counterweights fall at a relatively low tip angle, and these tips are incredibly slow. To answer the question that you left with opposing counsel, the testimony was from Dr. Colin Sorensen. He examined the photographs that are in Exhibit B, and he didn't just eyeball it. He did an extensive, detailed analysis of it to determine that this entire tip event did take three minutes. This was an incredibly slow event, and had Mr. Williams, who did not know that these unsecured counterweights could fall and could impact the cab, had he known, he had ample time and opportunity to get out of the crane. Let me make sure what you're saying about the three minutes, and obviously opposing counsel is a somewhat different way to characterize it. When you look at this, it looks to me as if that warning is saying you have to be at a fairly extreme angle. The crane itself, the track does, and that's what it's being warned of. I don't want to estimate what the angle is. So at least for some part, even if Williams, I don't know if you had expert testimony, that Williams would have known for that whole three minutes that a tip was starting to occur. Was there testimony to that effect? There was testimony that we don't know from Mr. Williams himself because of his incapacity. He was unable to testify. However, there were multiple people on the ground who testified that this was an extremely slow tip. Well, but did anybody say three minutes, that we were aware for three minutes that there was starting to be a problem? No. However, there was testimony that it was slow, and they knew for longer than a matter of a couple of seconds that the tip was occurring, that the crane was tipping forward. A long time between a couple of seconds and three minutes, so just where that was is a jury question probably. Yes, sir. But it seems to me that when it looks to be a very severe angle is what this warning is showing, and this warning was given to the jury as the alternative warning that should have been used by the manufacturer. It was evidence of an alternative warning. It should be conveyed by the crane company, which knew that these counterweights do fall. It's not a jury here. We know what the argument is. So it seems to me that your client had a choice to make through doing that whole period of time, and what this warning would have told him is something that needs to be a jury, needs to decide what was probably given to the jury and whether they could resolve it in the way that they did. But at some point, he would have to have made a decision if he knew there was a danger of staying in the cab of just when to exercise his option to try to escape from it. And depending on when that was, it may not have been an option anymore because just getting out of the cab is hardly sufficient. He's got to get well away from the whole crane. So it just seems to me your argument depends an awful lot on the wide discretion of juries, and there is wide discretion of juries. But it is sort of a tough factual case to make that certainly abandoning the crane at the three-minute point would have been far too soon when there was no threat yet, maybe threat, but no real sense yet that it was going to become this severe. And by the time he made the decision, it may have been too late. So this needs to be the proximate cause of his injury, this failure to have this warning that Judge Jolly has not yet embraced, but we're all looking at it. So do you have any reaction about does this discretion of the jury take care of all the options that are concerning the panel? Yes, Your Honor, and here's why. Manitowoc made these same arguments at trial. From the opening statement through its presentation and cross-examination of witnesses through its closing argument, this was the position that was argued by Manitowoc, among others, that the timing issue that they wouldn't be able to react. What the testimony was, which was undisputed from Paul Lewis, plaintiff's biomechanics expert, was that Mr. Williams had ample time to simply open the door, walk down the catwalk, and away from the crane. Dr. William Senghose testified to the same effect, that he had ample time to safely evacuate the crane. And further, the effects of this slow tip, this really slow-moving tip, created— Mr. Lewis testified that it created no additional forces on the operator of the crane, on Mr. Williams, other than 1G, which is what we are experiencing here in this courtroom today. So this isn't a situation where, say, a car gets in a wreck at 60 miles an hour and rolls or spins at multiple revolutions or rotations per second, but rather an extremely slow event that there was ample time for him to get away from it. And further, the undisputed testimony is— But how did he know they were falling? He didn't, and that's the reason why Manitowoc should have warned. The knowledge that— If there's no other warning other than that, that just tells you what is plainly obvious. And then, as Judge Southwick has pointed out, the suggestion is that these counterweights won't fall until you are at a really steep angle. Your Honor— What my problem is, is the causal connection of this—the absence of this warning to the accident. Yes, sir. This would have prevented it. All right. To answer that question, let me discuss the knowledge. We have no one at V.T. Halter Marine. And the three witnesses who testified, there were 77 years of experience in cranes and around cranes and at shipyards. And to a man, these three witnesses testified that they never knew nor could they envision that these counterweights could fall in the event that the crane tipped. And again, understanding that cranes tip and operators do things to try to save the crane to save the load, they do this without the knowledge that these unsecured falling counterweights can fall. And when that is contrasted with what Manitowoc knew, which is what the statute requires to know when it knows or should have known about the danger which causes the defect. And Paul Lewis testified that Mr. Williams would not have been injured if the falling counterweights had not impacted the cab. That when you have—they have a duty to warn of what the ordinary user or consumer doesn't know. And the V.T. Halter personnel testified uncontradicted that no one at V.T. Halter Marine knew these counterweights could fall. And what Manitowoc knew was— Would you agree that if one concludes that this warning would have had no effect on the entry, then the warning is ineffective and you would lose? No, Your Honor. No, Your Honor. Manitowoc, how can you win this case if I assume this warning is totally ineffective to have prevented the accident? How am I going to rule in your favor? The Mississippi Product Liability Act does not require any specific placard or warning or language. There is no case that points to a given warning should contain X or Y. But don't you have to show that there was a better warning that could have been given? No, Your Honor. That would be an inadequate warning case. And what we have here is a no warning case. That's the case that's been tried from the beginning. Counsel, it seems to me what you're really addressing is the same issue I had with your friend on the other side, and maybe not best friend, but nonetheless friendly colleague on the other side. And it seems to me it's an interpretation of the Product Liability Act. It's a state law issue of how much of the ramifications, how much of the detail, almost secondary effects of the tipover must be the warning, or does the statute just require, which is not the ultimate event, I guess, the foundational event, that a tipover is going to cause tremendous problems, fatalities or potential. Is this a question that makes some sense to certify to the Mississippi Supreme Court of does the general warning of death ensuing on the very thing that happened, the tipover, or must you step that down, and if so, in what way, to the specific variety of things that, I don't know if you would agree with all of them, but it does seem to me the record supports there are a lot of things that could be warned about insofar as the manner in which death or serious injury could occur. Isn't this an unsettled state law issue on the detail required in a warning? No, Your Honor, and here's why. Your Honor asked earlier about a case that would give us direction on that. I would point the court to the Mississippi Valley Silica Company v. Barnett, which we discuss on page 17 of our brief, and in that the critical inquiry is the knowledge, and that's what we have here. We have a manufacturer with knowledge before this crane was ever delivered to Manitoba. We still have to know what must they have knowledge of, and you're saying it must, I mean there could be ten different things that could happen when the crane starts to fall. And Manitowoc, first time I try to say it open court, I probably shouldn't have, may have known about all ten of these. Do warnings need to be given on all of them, or is it sufficient under Mississippi statutory law to warn of the central problem, which is the tip over itself? No, Your Honor, and the reason why is that even with the tip, as with the two 18,000s that the jury properly did consider, the operator wasn't injured because the counterweights did not strike the cab. Well, I'd like to give you some more time if the presiding judge would, because I don't want to take up all your time. You've got points to make yourself. But the question I would ask you is must the jury have found, in order to rule in your favor, that this warning would have prevented the injury to the planet if adhered to? No, Your Honor, and the reason is they do an adequacy determination. So if that's true, that they need not find that, then no warning was necessary. No, Your Honor, a warning was necessary. Then if the warning is totally ineffective to preventing the injury, why is it necessary? But the warning is effective to prevent the injury, Your Honor. I asked you that, and you said no. You didn't have to prove it. The jury didn't have to show that. Your Honor, again, the knowledge that must be—we examined the knowledge that Manitowoc has. They had three prior incidents where these counterweights fell, and in the one in 2009 with the 16,000, an operator was injured when the counterweight hit the cab. And the question— You've got a very good point. I mean, I'm not—I'm just saying if this danger had said we have had this before, and if you tilt the crane at a certain point or tip it at a certain point, you are endangering yourself and your life or something like that, and that would have been— Anyway, I'm belaboring the point, and you go ahead. Your Honor, all I would say is, again, as to the knowledge element, Manitowoc knew of three of these that tipped, all of which used the exact same unsecured counterweight design that is, again, peculiar to the 16,000 and 18,000 cranes. This isn't a design used by any other manufacturer. And so Manitowoc knew that these cranes would tip, first of all. Number two, they knew that when they tipped, these unsecured counterweights would not remain on the counterweight tray because in 100 percent of those cases, that's exactly what happened. And in the instance of the 16,000, which is what Mr. Williams was operating, they knew before this crane was ever delivered that the counterweight would impact the cab and injure the operator. And then after the fact, after it was delivered, we discuss in footnote three of our brief, there were three other tip-overs other than the Williams incident. This may have been a dangerous product. It may well have been. I don't know that. But the question is not whether it was a dangerous product. The question is whether this was an adequate warning. Well, the question, Your Honor, is were the given warnings adequate? And the jury, which was well within its province to do so, concluded that no, they were not, that Manitowoc knew of the danger. By way of their verdict, they found that Manitowoc knew of the danger, had a responsibility to warn of the danger, and did not warn of the danger. This was a jury question that was properly submitted, as Judge Osherden pointed out in his order on the motion for judgment as a matter of law. There were factual issues all over the case that the jury was allowed to consider and properly did consider. Counsel, I want you to stop there. We've explored this enough. Can I move on to another? Sure. In other words, sure. I'd give him some more time if I were beside him, but I'm not a judge. Well, I'm not going to. Three more minutes and also for Mr. McDaniel later. How about the misuse issue? There certainly is some argument in the opening but a lot in the brief that none of this would have happened if the cranes had been properly used. Your Honor, misuse was, again, a hotly contested issue. The main witness they cite on this is Mr. Parnell, and on cross-examination, Mr. Parnell was thoroughly impeached on this issue. They discuss the operation of the crane without a load cell. The testimony from Mr. Parnell that he conceded was that, number one, the manual says it is perfectly acceptable. Manitowoc's manual says it's perfectly acceptable to operate the crane without the load cell. Further, the operator instructions which were provided by Manitowoc were inapplicable to the lift that we had here. The testimony was that the instructions were for what's called a static lift where one crane has a load suspended from the end of its boom. What we had was a dynamic or tandem lift where you had two cranes attached to the same load, which creates horizontal forces. Dr. Singhose testified that essentially the cranes were pulling against each other, and the load cell at issue would not detect these horizontal forces. In fact, Dr. Singhose's analysis showed that at five-degree payload swing, in other words, the load being pulled away five degrees, would show only 1,145 pounds of force on the computer, but in actuality there's over 208,000 pounds of force being applied on the crane. You had answers, I'm sure, from the briefing to all the arguments by the crane manufacturer. Did you have any witness that identified the cause of this disaster? Not the specific injuries to your unfortunate client, but why this collapse occurred. Yes, Your Honor. The testimony from Mr. Alan Salta, who was at the time of the deposition the 30B6 representative. He was replaced at trial by Mr. Van Eegren. He testified, and there was an issue with supplementing the record and the deposition testimony that was presented to the jury, but that at 23048, which was presented to the jury, Mr. Salta testified that the Williams crane was pulled over by the Smith crane. The tandem, the other crane on the ground pulled him over, and that's what the testimony was at trial. Doesn't that mean that someone operating those cranes made a mistake that should not have happened? That was a jury issue that the jury resolved, and in their unanimous verdict, they said that there was a combined and concurring issue where they allocated fault. They allocated fault on Manitowoc for 40%, on VT Halter for 50%, and on Mr. Williams for 10%. Fault for the injuries? For the injuries, yes, sir. So that's not really fault for the overall collapse of the movement of this bow? That's correct. In fact, the jury was charged on misuse, though. Judge Ogerden instructed them per Manitowoc's request on misuse, and the jury had to find, in order to find for the defendant on that, that there was a misuse of the crane. The misuse was an abnormal and unforeseeable mishandling of the crane and was the sole proximate cause of the injury. The jury heard that charge. The jury rejected that charge by virtue of its verdict in favor of the plaintiff. This was another jury question that was resolved ultimately in plaintiff's favor. Just as proximate causation was, this was in the province of the jury, and they were proper to do so. And further, I would say that there was testimony from their own witness that Mr. Williams didn't, Mr. Parnell, their crane expert, testified that Mr. Williams did absolutely nothing to cause this tipover, and he said that at 2-7-3-2-1 in the record. Now, Your Honors, as my time is limited, I will say that unless the court has any more questions on the judgment as a matter of law, the trial court, I will shift briefly to the motion for new trial. Those were all within the trial court's proper discretion, and there was no error. Dr. Senghose was eminently qualified to testify. He's authored warnings. He's a tenured professor at Georgia Tech, Ph.D. mechanical engineer from MIT, masters from Stanford in mechanical engineering. He's authored warnings. The 18,000 tipovers all involve the exact same unsecured counterweight design, these 18,000-pound counterweights, and there was no error in excluding the specific instances of conduct under a 4-3-3 analysis. The judgment is due to be affirmed. Thank you. In response, first to your question, Judge Jolly, with respect to did plaintiff have to demonstrate that this warning would have prevented his injury, the answer to that is unequivocally yes. The Mississippi Project Liability Act defines an adequate warning as one that communicates sufficient information on the dangers and safe use of the product. Safe use of the product means you don't get killed by it. What do you have to say about his argument that this is not an adequate warning case but a no warning case? Whether it's a no warning or an adequate warning, that typically has been a reliance question. The Act defines an adequate warning, so one can assume if it's a no warning case, what you put in there has to meet the Act in defense of being an adequate warning. The Act does not give you the hedge that we have here. This accident resulted from misuse, and the misuse is delineated in our briefing. It is by the fact people, the fact testimony, also delineated. It was known that his load cell was not functioning on the day of the accident. The gentleman operating the crane said that it wasn't working. This is a critical lift. Anytime you use two cranes to lift anything is defined in the industry as a critical lift. They're supposed to have a lift plan. The lift plan was deficient in a number of ways, including, very obviously, it was to have been conducted in person. Instead, they did it by radio. With the two flaggers that are supposed to be watching the lines, they didn't have radios that were functioning. So the lift plan, everything from the get-go was wrong, and that's what caused the upset. With respect to the jury's discretion and to your question, the jury apportioned fault. They apportioned fault on one liability finding, that this crane was unreasonably dangerous. So they have somehow divided out that 40% of this accident was management's fault because of the inadequate warning, and that gets to the proximate cause question and the speculation and the complete disregard of the misuse. Proximate cause is the cause that directly produces an event without which the event would not have occurred. An element or test of proximate cause is that an ordinarily prudent person should reasonably have foreseen that some injury might probably occur as a result of his conduct. We know, all the crane operators knew that tip-over could have a serious result. It is not necessary to foresee the particular injury, the particular manner of the injury, or the extent of the injury. Inadequate warnings cannot serve as a proximate cause of injury where adequate warnings would have resulted in the same injury. In other words, sticking in this other warning is not interrupting what put all of this in play, and what put this in play was the way the crane was used on the day of the incident. Excuse me while we're talking about what is legally required. I can see benefit, though uncertain benefit, to a more detailed warning, but that's not our issue. Our issue is what does Mississippi require as far as the detail of the warning? How would this have helped the plaintiff in this case? They may have heard him to get out of the cab, killed him, well, and just maimed him for life, but all that is more or less for the jury once we resolve the legal question of how much detail must be in the warning. I think there is case law that addresses that. As I cited earlier, Harris is a case that comes out of Mississippi, and that case . . . Well, you don't have to go through your cases again. You've got them briefed. I don't think the question is unresolved. There may not be a Mississippi Supreme Court case. There are certainly cases that have come up in the Mississippi courts and in the district courts in Mississippi looking at the issue, and they have not held that you have to specifically identify the particular instrumentality or the consequence of . . . There has to be, notwithstanding the adequacy of the warning under law, there has to be some causal connection between the inadequate warning and the injury. That's aside from the adequacy of the warning, the causation. Absolutely, and that's the proximate cause instruction gets to that. In essence, you have an event that is put into motion by the misuse. If anything, the claim against Manitowoc is an intervening event. So the question then becomes, does it rise to the level of preventative? The answer to that is no. The underlying misuse is the proximate cause of the end result. The intervention of this, if you call it a warning, the intervention of this placard changes nothing in the sense that this tipover was happening because of how the claim was being used. And you can call the claim being pulled away from the other one. That results to an overload. You have to keep your load centered relative to the center of gravity. If you have two claims and suddenly this is being pulled this way, it's going to overload the other claim because that radius changes. Going over that slope will make a load shift, and when that radius shifts out like a pendulum, that overloads the claim. He was at almost capacity by Mr. Smith's view, and he had the same claim. So it is the misuse that is the proximate cause of this, and no warning has been shown would have changed the tipover and the result that everyone knew could happen from a tipover. The claim was reasonably safe. It contained adequate warnings. In this product liability case, were any other product liability claims made other than adequate warning? Yes, Your Honor. And were any of them settled or presented to the jury? The alternative design case the judge struck with respect to the other one, he talked about this load cell and a warning with respect to tandem lifts. The jury found not in plaintiff's favor on that because in that particular warning situation, Dr. Sinkos didn't even come up with an example. So no settlement of money has been paid in this case? Not from Matterport, Your Honor. Not from Matterport. And so it all goes down, this is the only thing that has ever been an issue as far as you're concerned. It's a warning? For trial, yes, Your Honor. You asked questions about the three minutes, and again, I would refer you to the briefs and to the fact testimony of the individuals there. And in particular, a comment was made with respect that these tilts happen all the time. The crane operators there had never seen a tipover. One had seen one. None had ever experienced it before. Now, if these tilts are happening all the time, and if what Dr. Sinkos is true, we would see counterweights being scattered everywhere. And even more importantly, Mr. Smith on the opposing crane was trying to lower his boom. When the bow rolled, it took his boom and slung it. My mother would be unhappy with that word. Slung it back over his cab, breaking it off, caused his 16,000 crane, by his testimony, to rise six feet in the front and seesaw up eight feet in the back and come down. Mary, a counterweight, moved. And even after this event, three weeks later, he's back in his 16,000 operating cranes. He testified, too, that there are cranes out there that don't have secure counterweights. The crane is reasonably safe, and it had reasonable warnings. Thank you. Thank you all, counsel, for helping us understand this case.